**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-00618-ABJ** |
| **RILEY JUNE WILLIAMS,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Riley June Williams to 87 months' incarceration, at the upper end of the applicable sentencing range, three years of supervised release, $3,039 in restitution, and the mandatory special assessment for each count of conviction, totaling $270.

### I. INTRODUCTION

The defendant, Riley June Williams, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

The evidence at trial showed that Riley Williams was acutely aware of the constitutional significance of January 6 and intent on disrupting Congress' certification of the 2020 election by any means necessary. On January 6, 2021, Williams followed through on that goal by invading the U.S. Capitol building, directing other rioters, organizing violence and physical resistance against law enforcement officers, and stealing—and helping to steal—items from Speaker of the House Nancy Pelosi's office. Everywhere she went, Williams acted as an accelerant, exacerbating the mayhem. Where others turned back, she pushed forward. When officers blocked her path, she recruited other rioters, especially larger men wearing helmets and body armor, gathered them together, and pushed them forward like a human battering ram, using the mob as a weapon to break through the police lines. The officers she faced off with were among those injured. Then, in the 12 days between the riot and her arrest on January 18, 2021, Williams repeatedly destroyed evidence and tried to evade law enforcement officials: she deleted her social media and communication accounts, instructed others to delete messages and take down videos from the internet, reset her iPhone, switched cellular phones, and used advanced software to wipe her computer.

The government recommends that the Court sentence Williams to 87 months' incarceration for her six trial convictions, including multiple felony convictions. The government's recommendation is at the upper end of the applicable Guidelines range of 70-87 months. A sentence of 87 months reflects the gravity of Williams' conduct and holds her accountable for her outsized and chilling participation in—and furtherance of—the chaos and violence that occurred on January 6, 2021, as well as her efforts to destroy evidence and her complete lack of any remorse for her crimes.

## II.       FACTUAL BACKGROUND

### A.       Williams' Conduct Leading up to the January 6, 2021 Attack on the Capitol

Williams' online behavior and trial testimony from her acquaintances, including her then-boyfriend Mark Dalton,[2] demonstrated that in late 2020, Williams became obsessed with far-right white nationalist leader Nick Fuentes, considered herself a member of the "Groyper Army" (the self-ascribed nickname for Fuentes' most devoted followers), and was fixated on the idea that the 2020 presidential election had been stolen. Williams had a green "I'm with Groyper" t-shirt, which she wore to the Capitol on January 6, and her social media avatar displayed a cartoon image of herself wearing the same Groyper shirt (Gov. Trial Exs. 5.1, 3.20 and 9.15). According to Dalton, her then-boyfriend, Williams listened to one of Fuentes' "America First" podcasts every morning; when a new one was not available, she would listen to an old one. Between the November 3, 2020 presidential election and January 6, 2021, Fuentes' consistent message to his followers was that the election had been stolen and that they needed to travel to Washington, D.C. on January 6 to "stop the steal," meaning to stop Congress from certifying Joe Biden as president, by any means necessary.

In the months between the election and January 6, Williams made near-daily comments to Dalton indicating that she revered Fuentes, adopted his viewpoints, and was "obsessed" with the idea that the election had been stolen. She discussed the "stolen" election and the January 6 deadline on social media with others, including with those she befriended on Discord and only knew online, such as then-16-year old Jonah Thomas. She shared stolen-election-related memes, and researched January 6 online. Williams also expressed to Dalton that she wished to do "nasty

---

[2] The defendant and Dalton ended their romantic relationship shortly after Williams' arrest in this case.

things to Nancy Pelosi" and wanted to "kill" Speaker Pelosi. Prior to January 6, Williams also told Dalton that "something big is going to happen" at the upcoming rally, which was intended to "stop the steal of the 2020 election" and to "stop Mike Pence from certifying" the election results.[3]

Williams planned to drive down to Washington, D.C. on January 5, 2021, with her father and his friends, including Ryan Myers. On January 4, 2021, Williams shared on Discord "I'm so hype we're coming with numerous people" and "I was just on those steps with f[**]cking nick fuentes," in reference to the prior "Stop the Steal" rally in D.C. that she attended in December 2020 (Gov. Trial Ex. 17.3). On January 4, 2021, Williams' father also sent her, via text message, a link to an article that suggested violence was possible on January 6 (Gov. Exs. 7.11 and 17.1). The following day, Williams participated in a text message group chat with her father and one of those friends, who stated "Reckon we will see tomorrow? My bet is they go out with a whimper, not a bang!" referring to members of Congress (Gov. Trial Ex. 8.3).   In that same group chat, Williams' father and his friend indicated that they were bringing [tactical or body armor] vests, firearms, and ammunition with them to Washington, D.C. On January 6, Williams traveled to Washington, D.C. with her father and his friends, as planned.

### B.    Williams' Approach to the Capitol on January 6, 2021

On January 6, 2021, Williams attended former President Trump's rally on the Ellipse with her father and his friends. Afterward, they walked to the U.S. Capitol, approaching from the west.

On January 6, 2021, the U.S. Capitol building and its surrounding grounds were a restricted area because (1) the Vice President and his family would be visiting the Capitol for the election certification proceedings and (2) of pre-existing COVID-19 precautions. The restricted grounds

---

[3] The complete trial transcripts have not been received yet; these quotes are from the contemporaneous trial notes taken by the government attorneys during witness testimony.

were demarcated by bike rack barricades and "AREA CLOSED" signs. Williams was not dissuaded by those physical barriers: she personally filmed other rioters moving the barricades to the side and when she encountered a wall, she—and other rioters—turned a bike rack on its side and used it as a ladder to scale the wall" (Gov. Trial Exs. 3.2, 8.9, 8.10, 8.12, 8.13). She was not dissuaded by the presence of thousands of rioters battling hundreds of law enforcement officers on the West Plaza. She was not dissuaded by the presence of pepper spray or raw violence. Witnesses testified at trial that the West Front at this time was like a "war zone" (USCP Officer Luckel) that it was "chaos" (USCP Capt. Mendoza) and "violent" with "hand-to-hand combat" (Staffer Jaime Fleet).



*Gov. Trial Ex. 3.25, Photograph of Williams at the West Front around 2 p.m. on January 6, 2021*

One of Williams' traveling companions, Myers, testified he could see the violence, gas, barricades, and signs, and he turned back at the West Front prior to the breach. Williams, however, was not dissuaded by the violence or clouds of tear gas in the air. Instead, Williams weaved her

way through the chaos, scaled the northwest steps, and was among the first wave of rioters to move past the police to the Upper West Terrace and into the Capitol itself.

### C.   Williams' Breach of the Capitol, Use of Rioters to Break the Police Line, and Direction of the Mob to the Speaker's Office

At approximately 2:15 p.m., Williams entered the U.S. Capitol building through the Senate Wing Door, just two minutes after it was first breached by violent rioters. As she walked up to that entrance, she threw a water bottle at the building, watched (and filmed) another rioter use a wooden plank to knock the glass out of a window on the side of the Senate Wing Door, and observed rioters climbing through the smashed windows to enter the building (Gov. Trial Exs. 3.3 and 8.14). Once she entered through the adjacent door, she observed other rioters turning around and leaving. She implored them to stay, telling them "Don't run" when they attempted to exit (Gov. Trial Ex. 3.2). At the time Williams entered the Capitol, the House was still in session and many members of Congress and their staffs remained on the floors and in the galleries of the House and Senate chambers.

The riot at the U.S. Capitol on January 6, 2021, in which Williams participated, interfered with Congress's ability to certify the Electoral College vote in a timely fashion and the Secret Service's protection of the Vice President and his family. Shortly before 2:30 p.m., in response to the physical breach of the Capitol that included Williams, the House and Senate suspended the Joint Session of Congress. U.S. Secret Service agents evacuated the Vice-President and his family from the Senate Chamber to a secure location within the Capitol grounds at 2:26 p.m., 11 minutes after Williams entered. Simultaneously, U.S. Capitol Police ("USCP") officers and congressional security staff worked to evacuate the Speaker of the House, senators, members of Congress, and

their staffs, lock down the House and Senate Chambers, and protect the lawmakers and staff they could not immediately evacuate.

While the evacuations were underway, Williams moved to the front of the mob in the Crypt, where she encountered a small group of police blocking rioters from accessing the stairwell near the Memorial Door. There, at 2:27 p.m., with hundreds of rioters amassed behind her, Williams acted as a leader and organized other rioters to help breach the police line (Gov. Trial Exs. 2.4, 3.1 and 4.4). As she bragged in a Discord chat later that night:



*Gov. Trial Ex. 17.4, Excerpt from Williams' Discord chat with user collectorzani
about her tactics on January 6, 2021*

Photographs and videos of Williams inside the Capitol on January 6 show her engaging in

the exact "tactic" she described online:



*Gov. Trial Ex. 3.8, Photograph of Williams inside the Capitol pushing larger male rioters*
*wearing tactical and protective gear forward against the police line*

Once the rioters breached the police line at the Memorial Doors, Williams directed other rioters where to go to take advantage of the breach (Gov. Trial Exs. 3.1, 4.4 and 2.4, showing Williams on video yelling: "Go! Go! Up the stairs! Up the stairs!" and "Keep going, up the stairs!"), also waving and pushing some of them on their backs to urge them forward. As Williams described this moment to her then-boyfriend, Dalton, she "led an army up the stairs." As the rioters followed Williams and marched up the stairs, they chanted "Stop the Steal" (Gov. Trial Ex. 3.1). The stairs led directly to the office suite of the Speaker of the House of Representatives, Nancy Pelosi.



*Gov. Trial Exs. 3.1 and 3.9, Image of Williams directing rioters inside the Capitol to proceed past the Memorial Door area and up the stairs around 2:29 p.m. on January 6, 2021*

Williams used that same "tactic" to overcome police blockades repeatedly throughout the Capitol. As Williams herself explained in another Discord message just hours after the breach:





*Gov. Trial Ex. 17.3, Excerpt from Williams' Discord chat with user Imperator about her "good tactic" on January 6, 2021*

### D. Williams' Participation in the Ransacking of Speaker Pelosi's Office and Direction to Rioters to Take Speaker Pelosi's Laptop Computer

Williams herself also proceeded up the stairs, entered Speaker Pelosi's office suite around 2:32 p.m., and roamed its multiple rooms for nearly four minutes, recording herself as she went (Gov. Trial Ex. 3.17, Williams stating "I'm in Nancy's!"). When she entered Speaker Pelosi's main conference room, she observed a Hewlet-Packard laptop computer on the long table. She noticed another rioter examining the laptop and immediately commanded him, "Dude, take that f[**]king laptop!" (Gov. Trial Ex. 4.2). As the other rioter later manipulated the laptop and its cords, Williams filmed the theft that she had just commanded and encouraged, and further instructed the rioter, "Dude, put on gloves!" (Gov. Trial Ex. 3.16).

11



*Gov. Trial Exs. 3.16, 3.17, and 2.12, Screenshots of Williams' videos inside Speaker Pelosi's office and conference room around 2:34 p.m. on January 6, 2021 and a map of Williams' path through the Speaker's Office Suite*

Later, Speaker Pelosi's office staff reported that the laptop had been stolen, along with ceremonial gavels and other items. Meanwhile, according to Williams' social media posts and texts, she claimed that "i stormed into the capitol building and stole nancy pelosi's hard drive and gravel [*sic*]" (Gov. Trial Ex. 17.4; *see also* Gov. Trial Exs. 3.21, 3.22, 7.2, 17.1, and 17.3: Williams stating "I stole shite [*sic*] from Nancy Polesi"; "I took her gravel hammwr tbing [*sic*]"; "I took Nancy Polesis [*sic*] hard drives"; "I stormed the building and took her hard drive" "Nancy's"; "All they did was pepper spray me and take the gavel I stole from her office lol. Still have the HDD"; and "I stole some things from nancy pelosi's office her gravel [*sic*] and hard drive").

In another Discord post, in which Williams shared her own video of herself directing the other rioter how to take the laptop, Williams stated, "this is when we were trying to take the cord out of the laptop and acquired her hard drives" (Gov. Trial Ex. 17.4).

12



*Gov. Trial Ex. 17.4, Excerpts from Williams' Discord chat with collectorzani about her theft of items from Speaker Pelosi's office on January 6, 2021*

After joining and directing the ransacking and theft of the Speaker's office, Williams went out on the Speaker's balcony, where she could see the Capitol completely overrun and rioters streaming into the building from multiple points (Gov. Trial Exs. 3.18 and 3.39). After filming another video, Williams then moved to occupy the heart of the Capitol, the Rotunda, where she engaged in and led an extended verbal and physical confrontation with USCP and Metropolitan Police Department ("MPD") officers working to defend the Capitol, expel the rioters, and allow Congress to resume its work.

### E.  Williams' Verbal and Physical Attacks Against Officers in the Rotunda

Initially, after being asked to leave the Rotunda and Capitol shortly after 3 p.m., Williams verbally berated the assembled officers, yelling things like "F[**]k you. We'll remember your f[**]king face." And "You're a traitor. You're a traitor to this country" (Gov. Trial Exs. 1.1, 1.2, 1.3, and 1.4).



*Gov. Trial Exs. 1.3, 1.11, and 17.3, Screenshot of video showing Williams yelling at police in the Rotunda, along with her Discord post describing the interaction*

Next, Williams turned around and physically resisted the police by pushing her back and buttocks into the line of police officers, trying to force them to give ground and move backwards. (Gov. Trial Exs. 1.5, 1.6, 3.6, and 4.8).



*Gov. Trial Exs. 3.6 and 3.35, Screenshot of video showing Williams forcibly shoving her body against officers in the Rotunda*

Again, Williams acted as a leader and organizer of other rioters. She recruited and coordinated the efforts of other rioters, including telling them to "push against me!" in order to amplify the force she could apply against the police officers (Gov. Trial Ex. 1.6). She instructed other rioters to "Push! Back up more! Push against them!" (*Id.*) Instead of complying with the officers' requests to leave, Williams instead commanded the resisting rioters to "Lock arms! Lock arms! Push! Push!" so they could join strength, make themselves harder to move, and collectively resist and fight the officers (Gov. Trial Ex. 1.5). Other rioters followed Williams' directions. As the physical conflict between the rioters and police in the Rotunda intensified, becoming a veritable mosh pit, Williams continued to shout, "Keep pushing! Against them! Push!" and "Traitors!" (Gov. Trial Exs. 1.5, 3.6 and 1.8).



*Gov. Trial Ex. 1.5 and 17.4, Screenshot of Williams' resisting and impeding Officers inside the Rotunda, along with Discord chats from Williams describing her conduct*

Williams' organizing efforts succeeded. The crowd, including Williams, actively battled against the officers in the Rotunda for approximately 20 minutes. She was one of the very last rioters (of hundreds) to be expelled from the Rotunda. On her way out of the Capitol building she was jovial, chanting, and encouraging other rioters to join in the resistance and push against the officers (Gov. Ex. 3.4, Williams telling the incoming rioters: "If you push hard enough they'll budge!").

During the conflict in the Rotunda involving Williams, at least one police officer was injured. MPD Officer Randy Done testified at trial that he was sprayed with a chemical irritant, which disoriented and incapacitated him. Officer Done had to remove himself from the fight and retreat to a nearby bench to recover for several minutes. Officer Done's absence weakened the

already outnumbered group of officers.    Additionally, although she did not testify, portions of the body worn camera from Officer Rochelle Butler Elliott were shown to the jury, including physical confrontations between the defendant and Officer Butler Elliott (Gov. Trial Ex. 1.6). Like Officer Done, the body worn camera from Officer Butler Elliott shows she was incapacitated by the fight with the mob in the Rotunda, including Williams. Less than 30 seconds after her confrontation with Williams, Officer Butler Elliott had to retreat from the front line and recover.

In total, Williams spent approximately 90 minutes inside the U.S. Capitol building.

After leaving the Capitol, Williams climbed on top of the roof of a parked police car and celebrated what she and the mob had accomplished.



*Gov. Ex. 3.40, Photograph of Williams on top of a police vehicle after exiting the Capitol*

### F.  Williams' Lack of Remorse

During the evening of January 6 and the early morning hours of January 7, Williams reveled online in the violence and chaos in which she had participated at the Capitol. Primarily

17

using Discord and her cell phone text messaging service, she shared memes celebrating the terror experienced by lawmakers and their staff members, who were forced to shelter in place and fear for their lives (Gov. Trial Exs. 8.4 and 8.11). She narrated her own illegal conduct, step by step (Gov. Trial Exs. 17.3 and 17.4). She bragged about her "good tactic" of repeatedly gathering men wearing tactical gear together and then pushing them into police to breach their lines (Gov. Trial Ex. 17.3). She explained that after a police officer took the gavel that she stole from Speaker Pelosi's office, another rioter then recovered it from the officer, so she allowed the other rioter to keep it (Gov. Trial Ex. 17.4). She excitedly offered to share "incriminating evidence" of her actions—meaning her own photos and videos—with her online friends (*Id.*). And she bemoaned that their violent siege had not succeeded and told her father "of course" they should return to the Capitol on January 20 because "we won't go down without a fight" (Gov. Trial Exs. 17.1 and 17.2). She also made clear what she was fighting for, calling Vice President Pence a "f[**]king traitor" on January 6 for certifying the election for Joe Biden (Gov. Trial Ex. 17.3). On January 14, 2021, over a week after the violent riot, Williams stated to her father: "I've been told what I did was wrong by everybody but in my heart and soul I know what we did was patriotic and what is right and anybody who says otherwise should be condemned" (Gov. Trial Ex. 17.2).





*Gov. Ex. 17.3, Excerpt from Williams' Discord chat with user Imperator about Vice President Pence on January 6, 2021*



*Gov. Ex. 8.11, some images shared by Williams on Discord in the days following January 6*

### G. Williams' Efforts to Destroy Evidence and Evade Arrest

Within hours of leaving the Capitol, Williams realized she was in trouble; she learned that the FBI was coming after the rioters, and in particular looking for people who had been inside the Speaker's Office (Gov. Trial Ex. 17.3: on January 6 at 6:14 p.m., Williams stated "I heard the FBI is looking for who was in her office"). On each of the next ten days, Williams took actions to

destroy or hide evidence of her criminal conduct. She directed other Discord users to delete their chats with her about January 6, 2021. She deleted her own Discord chats. She deleted her Telegram chats, as well as the application itself. She used commercial-grade software to wipe the contents of her desktop computer six times. She deleted the Snapchat account of her then-boyfriend, Dalton, with whom she had shared information about January 6. She stopped using Snapchat herself and deleted all of her 700+ friends on the social media service. She factory reset her cell phone and obtained a new phone, new number, and new iCloud account, choosing not to transfer any of the data from her old phone to her new one. She directed her mother to delete their texts. She contacted people who posted videos about January 6 to YouTube in which she appeared and asked them to take the videos down. She used an IP blocker to make her Internet usage appear as if she was based in Malaysia. She removed the SIM card from her phone.

When asked by her father "what are you getting scared about", Williams responded, "people getting arrested for being in the capitol" and as a result she "deleted all my social media and photos and got a new phone and a new number" (Gov. Trial Ex. 17.2).



> **Father to Riley: 1/14/2021 7:16:05 PM**
> If you get arrested I&apos;ll do everything to get you out

> **Father to Riley: 1/14/2021 7:18:06 PM**
> Good for you...smart thinking

*Gov. Ex. 17.2, Excerpt from Williams' text chat with her father about deleting evidence related to January 6, 2021*

The following day, Williams messaged a friend that she planned to quit her job and go to Virginia to lay low because "evidence of me at the capitol" was getting out and it was "incriminating" (Gov. Trial Ex. 17.5). She packed up her car and left. Ultimately, however, law enforcement officials, working through Williams' family members, persuaded her to turn herself in.

## III.    THE CHARGES AND CONVICTIONS

On October 6, 2021, a federal grand jury returned an indictment charging Williams with eight counts, including, Count One (Civil Disorder in violation of 18 U.S.C. § 231(a)(3)), Count Three (Resisting or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1)), Count Five (Entering or Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1)), Count Six (Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2)), Count Seven (Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D)), and Count Eight (Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G)).

On, November 17, 2022, Williams was convicted of these six offenses following a jury trial. The jury hung on Count Two (Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2) and Count Four (Theft of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 641 and 2). The Government subsequently moved to dismiss these counts without prejudice, which the Court granted.

## IV.     STATUTORY PENALTIES

Williams now faces sentencing on six offenses of conviction, including two felony convictions. As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the following maximum penalties for her convictions:

1.      Count One, Civil Disorder, up to five years imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

2.      Count Three, Resisting or Impeding Certain Officers, up to eight years imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

3.      Count Five, Entering or Remaining in a Restricted Building or Grounds, up to 1 year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

4.      Count Six, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, up to 1 year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

5.      Count Seven, Disorderly Conduct in a Capitol Building, up to 6 months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

6.      Count Eight, Parading, Demonstrating, or Picketing in a Capitol Building, up to 6 months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Guideline calculations contained in the draft Presentence Report for Counts One and Three (Offense level 25, CHC I). *See* Doc. 133, draft PSR ¶¶ 47-48, 57-65. However, the draft Presentence Report incorrectly calculates the offense level for Count Five because it overlooks the cross-reference under U.S.S.G. § 2B2.3(c).

The correct Guidelines analysis for Count Five is as follows:

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G.  §2B2.3(b)(1)(A)(vii):  the  trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | **\*See below** | U.S.S.G.  §2B2.3(c)(1):  "If  the  offense  was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |

The cross-reference under U.S.S.G. § 2B2.3(c), which applies when the offense is committed with the intent to commit another felony, applies here. Despite the jury reaching a stalemate on Count Two, the trial evidence established by at least a preponderance of the evidence that Williams unlawfully entered or remained in the Capitol building—the crime of which she was

convicted in Count Five, the violation of 18 U.S.C. § 1752(a)(1)—with the intent to obstruct a congressional proceeding, in violation of 18 U.S.C. § 1512, which is a felony.

Other Judges in this district have followed this approach and applied the U.S.S.G. § 2B2.3(c) cross-reference based on similar conduct, even when the underlying 18 U.S.C. § 1752(a)(1) offense was a misdemeanor as it is here. *See, e.g.*, *United States v. Anthony Williams*, 1:21-cr-377 (BAH), Sept. 16, 2022 Sentencing Tr. at 49-51; *United States v. Bledsoe*, 1:21-cr-204 (BAH), Oct. 21, 2022 Sentencing Tr. at 76-78; *compare with United States v. Nicholas Rodean*, 1:21-cr-057 (TNM), Oct. 26, 2022 Sentencing Tr. at 5-11 (declining to apply the § 2B2.3(c) cross-reference to the § 1752(a)(1) misdemeanor conviction based on the case specific facts, where in the Court's assessment the defendant did not intend to obstruct, but noting "I think in many situations with many individuals the sum of the various pieces of evidence that the Government put forth at trial would certainly make out the guideline for obstruction of administration of justice [under the cross-reference]"). As succinctly explained by Chief Judge Beryl A. Howell in *Bledsoe*: "The guideline at 2B2.3 applies to Count 2, charging: Entering and remaining in a restricted building or grounds, under 18 U.S.C. Section 1752(a)(1). This guideline provides a base-offense level of 4 under the Guideline at Section 2B2.3(a). Two offense levels are added because the trespass occurred at a restricted building or grounds, under the Guideline at 2B2.3(b)(1)(A)(vii). It is then adjusted up to 25 offense levels pursuant to the guideline at 2B2.3(c)(1) and 2X1.1(a) because the offense was committed with the intent to commit the felony obstruction offense which adds up to 25 offense levels [pursuant to U.S.S.G. §2J1.2(a)], which I will explain shortly."

As in these other cases, § 2X1.1(a) applies, and so the base offense level is determined by application of § 2J1.2:

| Base Offense Level (adjusted) | 14 (from Count Two) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Williams entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work.   The substantive offense is thus Count Two, and the base offense level for that offense should be applied.<br><br>U.S.S.G. §2J1.2(a) – Obstruction of Justice |
|---|---|---|
| Special offense characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).<br><br>There are multiple bases for application of this offense characteristic, in light of U.S.S.G. § 1B1.3 which encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant, *see* § 1B1.3(a)(3).<br><br>First, as described above, in order to breach police lines and access sensitive area of the Capitol building, Williams (in her own words and documented by photographs and videos) repeatedly employed the tactic of gathering men wearing tactical gear, directing them at the police line, and pushing against them until the police moved, essentially using other rioters as a weapon or human battering ram.<br><br>Second, Williams occupied the Rotunda and directly used force to oppose police officers' efforts to clear her from the room. |

| | | |
|---|---|---|
| | | Third, Williams encouraged, directed, and organized other rioters' efforts to forcibly oppose the police in the Rotunda. |
| | | All of this conduct was done in an effort to overtake and occupy the Capitol and prevent the certification of the 2020 presidential election. |
| | | Fourth, Williams' participation in the forcible resistance in the Rotunda aided and abetted all of the other violent actors in the Rotunda, some of whom injured law enforcement officers such as MPD Officers Done and Butler Elliott. |
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |
| | | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B). |
| | | The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted for almost six hours while legislators were physically evacuated for their own safety. |
| Obstruction | +2 | U.S.S.G. §3C1.1 – Obstructing or Impeding the Administration of Justice |
| | | Same analysis as already set forth in Section II.G above and the draft Presentence Report, *see* Doc. 133, draft PSR ¶¶ 39, 61. |
| **Total** | **27** | |

The government agrees with the PSR's finding that all counts of conviction group, and so the combined offense level for the group is determined based on the highest offense level within the group, in this case, 27.

26

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. Accordingly, based on the defendant's total adjusted offense level of 27, Williams' Guidelines imprisonment range is 70 to 87 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As discussed in Section II of this memorandum, Williams' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Williams' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 87 months' imprisonment.

### B.      The History and Characteristics of the Defendant

As shown at trial, and detailed in the draft PSR, the defendant clearly knew what she was doing on January 6 – she was an ardent follower of Nick Fuentes' white nationalist movement and other extremist alt-right movements that were focused on "stopping the steal" and blocking the election from being certified for President-Elect Biden by any means unnecessary. *See* Doc. 133, draft PSR ¶¶ 93-94. Williams' actions on January 6, 2021 were not spontaneous, but rather the result of her deep-seated mindset that her belief that the presidential election was stolen gave her license to break the law. Prior to January 6, Williams told her then-boyfriend Dalton that "something big is going to happen" at the upcoming rally, which was intended to "stop the steal of the 2020 election" and to "stop Mike Pence from certifying" the election results.   Immediately

27

following the riot, Williams made similar statements online, calling Vice President Pence a "f[**]king traitor" on January 6 for certifying the election for Joe Biden.

In addition, following her arrest in this case, Williams failed on several occasions to comply with the terms of her pre-trial supervision. *See id.* ¶¶ 15-17. In totality, the defendant's history and characteristics weigh in favor of a term of incarceration at the top of the applicable Guidelines range.

C.     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a term of incarceration at the top of the applicable Guidelines range. Williams' criminal conduct on January 6, 2021—which included repurposing bike rack barricades to climb over barriers on restricted grounds, throwing a water bottle at the Capitol, entering the Capitol as part of a violent mob, using and directing other rioters to break through officers and gain access to more sensitive areas of the Capitol, penetrating to the Speaker's office, stealing a gavel from the Speaker's office, directing the theft of the Speaker's laptop, verbally berating and then physically attacking multiple officers herself, imploring other rioters to resist and attack officers, and climbing on top of a police vehicle to celebrate her anarchic, illegal conduct—was the epitome of disrespect for the law. Williams' conduct in the weeks following the riot, including her celebration and promotion of the violence, her plans to return on January 20, and her extensive steps to destroy evidence and evade law enforcement, likewise call for a significant sentence at the top of the guidelines.

When she entered the Capitol grounds and the Capitol itself, it was abundantly clear to Williams that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. She played

an active and sustained role in the mob for 90 minutes while rioters fought against officers and sought to disrupt the Congressional proceedings by audible, observable, violent, and destructive means. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public in general, and other rioters specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses and future attempts to achieve political goals through violence. *See Gall v. United States*, 552 U.S. 38, 54 (2007) (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.       The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

Given the egregiousness of Williams' conduct, a sentence at the top of the applicable sentence Guidelines is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Williams has a criminal history category of I, her history, characteristics, uncharged conduct, and trial convictions show a clear pattern of troubling behavior. *See* Section

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

VI(B) *supra; see also* Doc. 133, draft PSR ¶¶ 76, 93-94. Second, Williams has never expressed any remorse or contrition. In fact, her social media statements on and after January 6 show that she reveled and took pride in the violence and chaos in which she had participated at the Capitol, particularly breaches she had facilitated and rioting she had exacerbated (claiming "it was awesome" and sharing videos and photographs celebrating the violence).   Incredibly, in the days after the riot, Williams told her father "of course" they should return to the Capitol on January 20, 2021, because "we won't go down without a fight." One week after the violent riot, Williams summed up her true feelings about her role in January 6: "I've been told what I did was wrong by everybody but in my heart and soul I know what we did was patriotic and what is right and anybody who says otherwise should be condemned."

Williams' conduct and statements demonstrate that her sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of her felony conduct, violent rhetoric, and complete lack of remorse.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following two cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most comparable case is *United States v. Douglas Jensen*, 1:21-cr-6 (TJK), in which the defendant, like Williams, was convicted at trial of violating 18 U.S.C. §§ 111(a)(1) and 231(a)(3).[7] Jensen's conduct made him one of the faces of the January 6 riot. Intent on stopping the certification of the 2020 election and wearing a distinctive black "Q" sweatshirt (referring to the QAnon conspiracy theory), Jensen was one of the first rioters through the Senate Wing Doors (Williams entered the same way just a few minutes later) and once inside, he acted as a ringleader. On multiple occasions, Jensen worked to rile up the mob and encouraged rioters to penetrate further into the building. He led a group of armed rioters in a menacing pursuit of USCP Officer Eugene Goodman near the Senate Chamber. Jensen refused police orders to stand down and leave the building. Instead, he derided the officers as traitors and urged the mob to breach the police line. Despite Jensen's efforts to organize and direct other rioters against the police, however, the government did not seek a "leader/organizer" role enhancement pursuant to U.S.S.G. §3B1.1. Judge Kelly ultimately sentenced Jensen to 63 months of incarceration, approximately the midpoint of the Guidelines range of 57-71 months and just one month below the government's recommended sentence. Jensen, like Williams, was an instigator who exacerbated the riot. But Williams' conduct was worse than Jensen's. Jensen did not physically touch any law enforcement officers. Jensen did not steal anything from the Capitol or encourage others to do so. Jensen did not attempt to hide or destroy evidence of his crimes. Jensen turned himself in to law enforcement on January 8, 2021, before an arrest warrant had even been issued. And Jensen gave a voluntary,

---

[7] Unlike Williams, however, the jury also convicted Jensen of violating 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding).

truthful interview to FBI agents that day in which he admitted to, and took responsibility for, many of his crimes. Accordingly, Williams should receive a much stiffer sentence than Jensen did.

In *United States v. Anthony Williams*, 1:21-cr-377 (BAH), a jury convicted the defendant of violating 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding), as well as four misdemeanor counts. The Court sentenced him to 60 months of incarceration. Like Riley Williams, Anthony Williams entered the Capitol through the Senate Wing Doors, soon after the initial breach, though Riley Williams entered the building a few minutes before him. Anthony Williams smoked marijuana in the Capitol and was part of crowds that broke through the police line in the Crypt. He also resisted leaving the Rotunda. Unlike Riley Williams, however, Anthony Williams did not engage in physical opposition to law enforcement and thus earn a 18 U.S.C. § 111(a)(1) conviction. He did not direct other rioters to forcibly resist law enforcement. He did not steal anything or encourage others to do so. He did not destroy evidence. He was in the Capitol for a far shorter period of time. And he did not brag about his exploits on January 6 like she did. Riley Williams deserves a longer period of incarceration that the 60 months that Anthony Williams received after trial.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims

of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[8]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[9]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

---

[8]  While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[9]  The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[10]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

---

[10] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.  Here, the Court should find that Williams' conduct in entering the Capitol building as part of a mob, and remaining there for 90 minutes while confronting officers and egging on other rioters to do the same, caused damage to that building.

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[11]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *See* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each

_____

[11]  Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

Applying these principles to this case, the Court should require Williams to pay $3,039 in restitution for her six convictions. This amount fairly reflects Williams' role in the offense and the damages resulting from her conduct. Based on the declared values listed on the January 8, 2021, USCP Theft Report relating to items stolen from Speaker Pelosi's Office Suite on January 6, 2021, the laptop Williams directed others to steal had a declared value of $1,000 and the gavel Williams stole had a declared value of $39 (Gov. Trial Ex. 12.15). In addition, in January 6 felony cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon base amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 87 months' imprisonment, along with a term of supervised release of 3 years, $3,039 in restitution, and the mandatory special assessment for each count of conviction, totaling $270.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:  */s/ Samuel S. Dalke*
      SAMUEL S. DALKE
      Assistant United States Attorney
      Pennsylvania State Bar No. 311083
      228 Walnut Street, Suite 220
      Harrisburg, PA 17101
      samuel.s.dalke@usdoj.gov
      Telephone: 717-221-4453

      */s/ Michael M. Gordon*
      MICHAEL M. GORDON
      Assistant United States Attorney
      Florida State Bar No. 1026025
      400 N. Tampa St., Suite 3200
      Tampa, Florida 33602
      michael.gordon3@usdoj.gov
      Telephone: 813-274-6370